UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------x
                              :
JEFFREY GIBBS,                :
                              :
         Plaintiff,           :
                              :
v.                            :       Civ. No. 3:01CV00320(AWT)
                              :
CIGNA CORPORATION, LIFE       :
INSURANCE COMPANY OF NORTH    :
AMERICA, and CIGNA LTD PLANS, :
                              :
         Defendants.          :
                              :
------------------------------x
```

**RULING ON MOTION FOR SUMMARY JUDGMENT**

The plaintiff[1] commenced this action against the defendants pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. The plaintiff challenges the disability plan administrator's determination as to the amount of long-term disability ("LTD") payments to which he is entitled. For the reasons set forth below, the defendants' motion for summary judgment is being granted.

**I.   FACTS**

The plaintiff was employed by Connecticut General Life Insurance Company ("CGLIC") commencing in 1969. As an employee of CGLIC, which is a wholly-owned subsidiary of CIGNA Corporation, the plaintiff was a participant and beneficiary in

---

[1] The plaintiff is deceased and Elaine Gibbs, the plaintiff's widow and executrix of his estate, has been substituted as the named plaintiff in this action. (See Endorsement Order, May 27, 2005 (Doc. No. 46).)

the CIGNA Long-Term Disability Plan and the CIGNA Supplemental Long-Term Disability Plan (collectively, the "CIGNA LTD Plan" or "the Plan"). The terms of the CIGNA LTD Plan are embodied in a group LTD policy ("the Policy") issued to CIGNA Companies by Life Insurance Company of North America ("LINA"), which is also a wholly-owned subsidiary of CIGNA Corporation and administers the CIGNA LTD Plan. (See App. to Defs.' Mem. (Doc. No. 31), Ex. A.) The plan administrator provided the plaintiff and other employees of CGLIC with a description of, inter alia, the terms of the Policy in the form of a booklet referred to as a summary plan description. The parties agree that it is the April 1995 summary plan description ("the SPD") that, along with the Policy, govern the determination of the plaintiff's LTD benefits. (See App. to Defs.' Mem., Ex. L.)

In October 1995, the plaintiff became disabled due to a combination of medical conditions. From that time until May 1, 1996, the plaintiff received short-term disability benefits. On May 1, 1996, the plaintiff began receiving monthly LTD benefits.

The terms of the Plan entitle the plaintiff to receive a benefit payment based on 65 percent of his "eligible earnings." Eligible earnings are calculated approximately every July of the preceding enrollment year -- that is, the enrollment year preceding the enrollment year in which disability begins. Because the eligible earnings figure is "frozen" when short-term

disability begins, the Plan required that the plaintiff's benefit amount be determined based on his eligible earnings for 1995, which would have been calculated in July 1994.

Prior to 1994, the plaintiff was employed by CGLIC as Regional Vice President of the Springfield Agency, which was located in Springfield, Massachusetts, and was part of an organization known as "CIGNA Financial Advisors." During that time, the plaintiff did not have a regular base salary, but instead was paid entirely through variable compensation,[2] which included commissions and other payments relating to insurance sales generated from the Springfield Agency. The plaintiff's compensation in that position varied significantly from year to year, depending on the sales performance of the Agency. During those years he was paid a draw against earnings, subject to reconciliation at the end of the year based on the actual sales performance of the Agency. The average of the plaintiff's variable compensation, which constituted the plaintiff's entire annual compensation, for 1991, 1992, and 1993 was $200,083. The actual earnings figures for those years were $147,320.15 in 1991, $301,642.15 in 1992, and $151,285.82 in 1993.

Toward the end of 1993, the plaintiff accepted a new position as Vice President of New England Brokerage, which was

---

[2] Pages K-6 through K-8 of the SPD set forth the forms of variable compensation used to determine eligible earnings under the Plan.

to commence in January 1994.  This position was to be part of a new CGLIC business venture; the plaintiff was to be located in CGLIC's Bloomfield, Connecticut offices.  In December 1993, the plaintiff and CGLIC agreed to the terms of an employment contract to govern his new position, and those terms were later reduced to writing and the written contract was signed by CGLIC Senior Vice President John H. Gotta.  Attached to the complaint is a copy of the written contract signed by Gotta, which is a two-page document entitled "Jeff Gibbs' Compensation, Brokerage RVP" ("the 1994 Contract").  (See Pl.'s Opp. Mem. (Doc. No. 35), Ex. 1.)  The plaintiff claims that pursuant to the terms of the 1994 Contract he was paid in 1994 a "guaranteed salary" in the amount of $150,000, with the possibility of earning additional "bonus payments" based upon sales.  However, the 1994 Contract does not use the term "guaranteed salary"; rather it refers to the $150,000 figure as "minimum compensation", which is "guaranteed" in "Year I."  (Id.)  The "$150,000, minimum compensation" was "[g]uaranteed [in] Year II assuming objectives for Year I were achieved," and the "$150,000, minimum compensation" for "Year III" was not guaranteed at all by the written terms of the 1994 Contract. (Id.)  The plaintiff asserts that the minimum compensation was a salary, was not in any way based upon sales activities, and was not an advance against commissions.

The plaintiff's assertions regarding the form of his compensation in 1994 are critical to his claim that his eligible earnings were incorrectly calculated. Under the terms of the Plan in effect when the plaintiff became disabled in 1995, there were two different methods for calculating eligible earnings. One method was for employees described as "CIGNA Financial Advisors Associates and Staff People" ("CFA Associates" or "CFAA"), whose pay consisted exclusively of various forms of incentive-based compensation (referred in the SPD as "variable compensation"). (See App. to Defs.' Mem., Ex. A at 9-11 and Ex. L at K-6 to K-9.) The other was for "Employees Other Than CIGNA Financial Advisors Associates and Staff People" ("Non-CFA Associates" or "Non-CFAA"), whose pay consisted of a combination of a base salary and variable compensation. (See id.) The plaintiff contends that up to the time when he took his new position in 1994 as Vice President of New England Brokerage, he had been a CFA Associate, but that he was a Non-CFA Associate at the time he became disabled in October 1995.

The SPD defines "eligible earnings"[3] for Non-CFA Associates as follows:

> "[E]ligible earnings are paid or deferred salary expressed in annual terms as of a date set by the Plan

---

[3]The parties agree that "eligible earnings," as that term is used in the SPD, is synonymous with "covered earnings," as that term is used in the Policy. (See App. to Defs.' Mem., Ex. A at 9-11.)

> Administrator (usually July of the preceding year).
>
> Eligible earnings also include a three-year average of the following forms of variable compensation earned while a participant:
>
> - shift differential pay;
> - overtime payments;
> - short-term cash incentive bonuses (group or individual);
> - cash sales bonuses (group or individual);
> - discretionary bonus payments;
> - U.S. area differential;
> - annual office or group awards;
> - transaction pay;
> - CIGNA Individual Insurance commissions;
> - CIGNA Financial Advisors, Inc. commissions paid and earned after 1988;
> - catastrophe pay; and
> - other similar regular cash compensations recorded in payroll records if determined to be eligible earnings by the Plan Administrator.
>
> . . .
>
> The three-year average calculation is effective on the first day of each plan year. It is calculated on a date specified by the Plan Administrator. It includes all eligible earnings earned during the prior three calendar-year period. The calculation period may vary from year to year.

(App. to Defs.' Mem., Ex. L at K-6 to K-7.)

The SPD then goes on to define "eligible earnings" for CFA Associates as follows:

> "Eligible earnings for CIGNA Financial Advisors, Inc. Associates are based on a three-year average of all variable compensation earned while a participant.
>
> Eligible Earnings for CIGNA Financial Advisors Associates include:
>
> - CIGNA Individual Insurance commissions including Life, Health and Pension whether paid or deferred;
> - compensation such as overwrites, bonuses,

-6-

>       financing advances and salary, whether paid or deferred;
> - CIGNA Financial Advisors, Inc. commissions on investment products whether paid or deferred; and
> - short-term disability payments.

(Id., Ex. L at K-7.)

The plaintiff asserts that his eligible earnings were erroneously calculated by the CFAA method -- that is, by averaging his compensation for the three years prior to 1994. The plaintiff's eligible earnings were based upon his average annual compensation, which for the period in question consisted exclusively of variable compensation. The plan administrator averaged his compensation for 1991, 1992, and 1993, which was $147,320.15, $301,642.15, and $151,285.82, respectively. The resulting average of $200,083 is, according to the defendants, the plaintiff's eligible earnings amount. Sixty-five percent of that figure is $130,054, which is the annual LTD benefit that has been paid.

In August of 1995, two months prior to the effective date of his disability, and one year later in August of 1996, the plaintiff received statements from CIGNA regarding his employee benefit enrollment status. Both statements indicated that his eligible earnings amount for LTD benefit purposes was $342,073. The defendants maintain that the statements with $342,073 as the eligible earnings figure were the result of a computer error that had been caught in late 1995 and corrected for everyone

-7-

known to be active at that time, but not as to the plaintiff. They also maintain that at no time were the plaintiff's LTD benefits as of July 1994 calculated based upon any eligible earnings figure other than $200,083. The defendants refunded any premium paid based upon a $342,073 eligible earnings figure.

The plaintiff maintains that the correct eligible earnings figure is neither $200,083 nor $342,073, but $350,083, which the plaintiff contends he derives by using the Non-CFAA method; the plaintiff takes what he contends is his $150,000 "salary" for 1994 and adds to that figure the three-year average of variable compensation he received from 1991 through 1993, i.e. $200,083, which yields a total of $350,083. Under this approach, the annual amount of LTD benefits would be $227,556, which would be greater than his three-year average for 1991 to 1993 and also greater than his $150,000 "guaranteed salary" in 1994. In other words, although the Policy provides for a benefit that would replace 65 percent of the plaintiff's annual income, the plaintiff contends that he is entitled to a benefit that would replace approximately 115 percent to 150 percent of his annual income.

## II. <u>LEGAL STANDARD</u>

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such

issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law."  Id.  Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  Immaterial or minor facts will not prevent summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most

-9-

favorable to the non-movant and . . . draw all reasonable inferences in [its] favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation marks and citation omitted). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation or conjecture" is insufficient to defeat a motion for summary judgment. Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990) (citation and quotation marks omitted). Moreover, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmovant." Anderson, 477 U.S. at 252.

**III. DISCUSSION**

    **A.    Standard of Review for Denial of ERISA Benefits**

The parties disagree as to what standard the court should apply when reviewing the plan administrator's decision. The plaintiff claims that the Plan in question does not reserve for the administrator discretionary authority to determine benefits or interpret the Plan, and therefore, the court should review the decision under the de novo standard, citing Kintsler v. First Reliance Standard Life Insurance Company, 181 F. 3d 243, 249 (2d Cir. 1999). The defendants claim that the Plan in question reserves for the administrator discretionary authority to determine benefits or interpret the Plan, and therefore, the

court should analyze the decision under the "arbitrary and capricious standard," citing <u>Jiras v. Pension Plan of Make-Up Artist & Hairstylists Local 798</u>, 170 F. 3d 162, 166 (2d Cir. 1999). The court does not have to resolve this issue because it would grant summary judgment in favor of the defendants under either standard of review.

### B. The Plaintiff's Eligible Earnings Should Be Calculated by the CFAA Method

The plaintiff claims that his monthly LTD benefit is lower than it should be because the defendants have incorrectly calculated the eligible earnings from which the LTD benefit is derived. For CFA Associates, the figure for eligible earnings is the average of all variable compensation over the three years preceding the Plan Year, (<u>see</u> App. to Defs.' Mem., Ex. L at K-13), that precedes the year of disability. Eligible earnings, regardless of the method, are calculated as of the July of the Plan Year preceding the year of disability. In this case, the plaintiff was disabled in October of 1995, so his eligible earnings were required to be calculated as of July 1994. Under the CFAA method, then, eligible earnings consist of the average of variable compensation that the plaintiff received during 1991, 1992, and 1993. However, under the Non-CFAA method, eligible earnings equal the participant's salary in effect as of the July of the Plan Year preceding the year of disability <u>plus</u> the average of variable compensation received in addition to

salary over the three years preceding the calculation date specified by the Plan Administrator, i.e. July of the Plan Year preceding the year of disability. (See App. to Defs.' Mem., Ex. L at K-7.)

The plaintiff contends that he was receiving salary-based compensation, not incentive-based compensation, as of July 1994, so he was a Non-CFA Associate and his eligible earnings should have been calculated using the Non-CFAA method, not the CFAA method. The record here shows that the plaintiff was not receiving salary-based compensation in 1994. Moreover, assuming arguendo that he was, the record nonetheless shows that he was a CFA Associate and thus his eligible earnings were properly calculated using the CFAA method.

In an effort to differentiate himself from CFA Associates, the plaintiff points to the 1994 Contract. He contends that the term "minimum compensation" in combination with the terms "Guaranteed Year I" and "Guaranteed Year II" is synonymous with "salary." However, the 1994 Contract does not use the term "salary"; it merely states as to the first year "$150,000, minimum compensation" plus "25% of . . . commissions in excess of $150,000." Thus, even though the $150,000 "minimum compensation" is guaranteed in Year I, that compensation figure itself is explicitly linked to commissions. The "minimum compensation" for Year II under the 1994 Contract looks even

less like a salary and more like incentive-based compensation. In Year II the "minimum compensation" is guaranteed "<u>assuming objectives for Year I were achieved</u>." (Pl.'s Opp. Mem., Ex. 1, Attach. (emphasis added).)

There is nothing in the 1994 Contract that is inconsistent with the defendants' position that, for purposes of the SPD, the plaintiff was in 1994 still a non-salaried, incentive-based employee, i.e. a CFA Associate.  Moreover, based on the record in this case, no reasonable inference could be drawn based on this document that the plaintiff was a salary-based Non-CFA Associate.

In his effort to differentiate himself from CFA Associates, the plaintiff offers statements about the nature of his new position from his own deposition (<u>see</u> Pl.'s Opp. Mem., Ex. 3) and his affidavit (<u>see id.</u>, Ex. 2) as follows: there was to be no year-end reconciliation of actual sales to any draw; the plaintiff was an officer of the corporation; he had a Job Grade 58; he physically worked in the Home Office in Bloomfield; he participated in the same Pension Plan as other CGLIC officers who worked in the Home Office; and a "salary guarantee" was an essential part of contracting with the plaintiff to share in the risks of developing a new business venture.

In support of these arguments, the plaintiff points to his business cards spanning the transition period from the end of

-13-

1993 to the beginning of 1994, when he contends he went from being a CFAA incentive-based employee to a salary-based Non-CFAA employee. (See Pl.'s Opp. Mem., Ex. 2 ¶ 3 n.1.) He notes that not only does his address change from CGLIC's agency office in Springfield, Massachusetts to CGLIC's home office in Bloomfield, Connecticut, but that a reference to CIGNA Financial Advisors changes to "CIGNA Individual Insurance." (See id.; Pl.'s Opp. Mem., Attach. 2.)

However, the SPD defines a CFA Associate as "[a] Regular or Statutory Employee of CG (or a Regular Employee of CIGNA Financial Advisors, Inc.) who works in the <u>CIGNA Individual Insurance Division</u> under a contract that authorizes the person to act as an agent for the sale of life insurance and related products underwritten by CG (formerly called an 'IFSD Agent')." (App. to Defs.' Mem., Ex. L at K-6 (emphasis added).) Thus, for purposes of the SPD, one can be classified as a CFA Associate without necessarily being identified with the CIGNA Financial Advisors, Inc. organization. It is enough that one works in the CIGNA Individual Insurance Division.

In addition, the plaintiff's business cards for 1994 identify him as a CG employee who works in <u>CIGNA Individual Insurance</u>. The cards also identify him as a brokerage RVP (Regional Vice President) involved in brokerage activity, i.e. selling "Insurance products offered through CIGNA affiliates."

-14-

(Pl.'s Opp. Mem., Ex. 2, Attach. 2.)  Similarly, the 1994 Contract itself identifies the plaintiff as someone whose employment is subject to the terms of the "CIGNA Individual Insurance Human Resources Management Manual."  In addition, it makes it clear that the plaintiff is authorized to sell life insurance as well as "DI".

Moreover, in January 1994 there was an announcement by the president of CIGNA Financial Advisors, Inc., Edward Berube, describing a new "direct brokerage" strategy of which the creation of the plaintiff's new position was a part (the "Berube Memorandum").  (See Pl.'s Mem., Ex. 2, Attach. 1.)  It is apparent from the Berube Memorandum that in his new position, the plaintiff would remain in the CIGNA Individual Insurance Division.  It states:

- Direct Brokerage will be structured and managed as a separate and independent distribution organization within the Retail Business Sector.  It will not, however, be part of CIGNA Financial Advisors.  CIGNA Financial Advisors will be used exclusively and solely to refer to the CIGNA career agency distribution organization.

- Direct Brokerage will be managed by a VP of Brokerage reporting directly to me.  This individual will be part of my senior staff.  We are currently interviewing candidates for this position.

- With the implementation of our brokerage strategy CIGNA Individual Insurance Business Management responsibilities are as follows:
    - Retail (E. Berube)
        ‣ CIGNA Financial Advisors/Career Agency

-15-

>        ▸      Direct Brokerage
> •      Annuity (R. Bubbs)
> •      COLI (P. Bauer)
> •      New Ventures (A. Vayda)

(Id. at 1 (emphasis in original).)  Thus, while Direct Brokerage, which was the plaintiff's new business unit, would be structured and managed as a separate organization, it was part of the Retail Business Sector of CIGNA Individual Insurance Business Management.  Also, Berube was responsible for management of both Direct Brokerage and CIGNA Financial Advisors.

The plaintiff notes, in support of his position, that his new office was physically located at the Home Office in Bloomfield.  However, the Berube Memorandum states that the direct brokerage strategy would be "developed through a network of Regional Brokerage Offices" and that "each brokerage office will be managed by a Brokerage RVP." (Id. at 2.)  The objective was to open three to four of these offices in different regions of the United States.  (See id.)  Thus the plaintiff's reliance on the fact that his new office was physically located in Bloomfield is misplaced.  The court notes, moreover, that the plaintiff's business cards demonstrate that the plaintiff did not remain at the Home Office in Bloomfield, but moved to Hartford, (see Pl.'s Mem., Ex. 2, Attach. 2), where Berube's office was also located.  (See Pl.'s Mem., Ex. 2, Attach. 1.)

Thus, the plaintiff's efforts to create a genuine issue as

to whether his new position was materially different from his former one for purposes of whether he was a CFA Associate or Non-CFA Associate are unavailing. The record here demonstrates conclusively that the plaintiff's new position was covered by the definition of CFA Associate set forth in the SPD.

The court concludes that there is no genuine issue of material fact as to whether the plaintiff was a CFA Associate and his eligible earnings should have been calculated using the CFAA method, and also concludes that based on the undisputed facts, the defendants are entitled to judgment on the plaintiff's claim as a matter of law.

**IV.   CONCLUSION**

For the reasons set forth above, the court finds that there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law. Accordingly, the defendants' motion for summary judgment (Doc. No. 28) is hereby GRANTED.

It is so ordered.

Dated this 13th day of June 2005, at Hartford, Connecticut.



                                          /s/
                                   Alvin W. Thompson
                              United States District Judge